Matthew L. Sharp, Esq.
Nevada Bar No. 4746
MATTHEW L. SHARP, LTD.
432 Ridge Street
Reno, NV 89501
(775) 3214-500
matt@mattsharplaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DOREEN R. LAMPERT, Derivatively On Behalf Of CELSIUS HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN FIELDLY, NICHOLAS CASTALDO, CAROLINE LEVY, HAL KRAVITZ, ALEXANDRE RUBERTI, CHERYL S. MILLER, DAMON DESANTIS, JOYCE RUSSELL, AND JAMES NEGRON, <br><br> Defendants, <br><br> CELSIUS HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Doreen L. Lampert ("Plaintiff"), derivatively and on behalf of Celsius Holdings, Inc. ("Celsius" or the "Company"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Celsius, Company press releases and conference call

transcripts, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Celsius against certain of its officers and directors seeking to remedy Defendants' (defined below) breach of fiduciary duties, insider trading, unjust enrichment and violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between August 12, 2021 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      The Company describes itself as in the business the development, processing, marketing, sale, and distribution of functional drinks and liquid supplements to a broad range of consumers.  During 2021, the Company experienced strong increasing revenue.  During the second and third quarter, nine employees and directors resigned or were terminated from the Company.  As more fully discussed below, these events were given initial improper accounting treatment, reporting, and disclosure resulting in enormous overstatement of net income.

3.      This action is based on these false and misleading statements, and weaknesses in internal controls at the Company during the Relevant Period.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Sections 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

5.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs, complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

6.     Additionally, venue is proper as required by the Company's By-laws[1] which provide in relevant part:

> Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation by a person other than the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of the NRS or the Articles of Incorporation or these Bylaws, or (d) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation governed by the internal affairs doctrine, shall be the Eighth Judicial District Court of Clark County of the State of Nevada (the "Court") (or if the Court does not have jurisdiction, the federal district court for the District of Nevada). Any person who, or entity that, purchases or otherwise acquires an interest in stock of the Corporation will be deemed (i) to have notice of, and agree to comply with, the provisions of this Section 1, and (ii) to consent to the personal jurisdiction of the Court (or if the Court does not have jurisdiction, the federal district court for the District of Nevada) in any proceeding brought to enjoin any action by that person or entity that is inconsistent with the exclusive jurisdiction provided for in this Section 1.

## PARTIES

### A.     Plaintiff

7.     Plaintiff is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

### B.     Nominal Defendant

8.     Nominal Defendant is incorporated under the laws of Nevada with its principal executive offices located in Boca Raton, Florida.

### C.     Directors

9.     *Defendant John Fieldly* ("Fieldly") has served as Chairman of the Board since August 2020, as Chief Executive Officer ("CEO") since April 2018 and a member of the Company's Board of Directors ("Board") since March 2017.  Defendant Fieldly originally joined Celsius in January 2012 as its Chief Financial Officer ("CFO") and from March 2017 to March 2018 served as Interim Chief Executive Officer and Chief Financial Officer.

---

[1]     "By-laws" refers to the Company's By-laws as amended, attached as exhibit 3.2 to its Form 10-K for the fiscal year ended December 31, 2021.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10.     Defendant Fieldly engaged in illicit insider trading by misappropriating nonpublic and material information regarding the Company's improper accounting of its share-based compensation payments. In particular, and as further alleged herein, Defendant Fieldly entered into a 10b5-1 trading plan during the Relevant Period – on November 30, 2021 – and less than four weeks later, sold 20,000 shares at the artificially inflated share price of $75, for proceeds of $1.5 million.  Defendant Fieldly signed the Company's Forms 10-Q for the second and third quarters of FY 2021.

11.     **Defendant Nicholas Castaldo** ("Castaldo") joined the Board in March 2013.  At all relevant times, Defendant Castaldo was a member of the Human Resources & Compensation Committee and Governance & Nominating Committee.

12.     **Defendant Caroline Levy** ("Levy") has served as a director of the Company since July 2020.  At all relevant times, Defendant Levy was a member of the Audit & Enterprise Committee and Governance & Nominating Committee.

13.     **Defendant Hal Kravitz** ("Kravitz") became a director of the Company in April 2016.  At all relevant times, Defendant Kravitz was a member or lead director of the Human Resources & Compensation Committee.

14.     **Defendant Alexandre Ruberti** ("Ruberti") joined the Board in February 2021.  At all relevant times, Defendant Ruberti was a member of the Human Resources & Compensation Committee.

15.     **Defendant Cheryl S. Miller** ("Miller") joined the Board in August 2021.  At all relevant times, Defendant Miller was the Chairperson of the Audit & Enterprise Committee and a member of the Governance & Nominating Committee.

16.     **Defendant Damon DeSantis** ("DeSantis") joined the Board in August 20Celsius21.  At all relevant times, Defendant DeSantis was the Chairperson of the Governance & Nominating Committee.

17.     **Defendant Joyce Russell** ("Russell") joined the Board in August 2021.  At all relevant times, Defendant Russell was a member of the Audit & Enterprise Committee and Chairperson of the Human Resources & Compensation Committee.

18.     Defendants Fieldly, Castaldo, Levy, Kravitz, Ruberti, Miller, DeSantis, and Russell are referred to herein as the "Director Defendants".

19.     The Director Defendants breached their duties to the Company by making or causing the Company to make false statements that artificially inflated the price of the Company's securities during the Relevant Period.  The Director Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

**Director Non-Defendant**

20.     *Jim Lee* ("Lee") was appointed to the Board in conjunction with a securities purchase agreement with PepsiCo. on or about August 1, 2022.    Lee is a member of the Company's Audit & Enterprise Committee and Governance & Nominating Committee.

**Officer Defendant**

21.     *Defendant Edwin Negron* ("Negron") was the Company's Chief Financial Officer ("CFO").

22.     The Director Defendants and Defendant Negron are herein referred to as the "Individual Defendants."

**Relevant Parties**

23.     Confidential Witness ("CW")[2] 1 is a former employee of the Company who worked at its Boca Raton office from April 2018 through February 2022.  CW1 joined the Company as the Head of Sales for the vending sector and was later promoted to Head of Sales for the Company, reporting directly to Jon McKillop, the EVP of Sales, North America, until approximately December 2020.  CW1 worked directly with Defendants Fieldly and Negron while employed at the Company.

///

---

[2]     All references to Confidential Witnesses are based upon information and belief and are found in the securities class action entitled *City of Atlantic Police Officers' Pension Plan, et al., v. Celsius Holdings, Inc., et al.*, Case No. 9:22-cv-80418 (DMM) (WDM) (S.D. Fla.) ("Securities Class Action").

24.     CW2 is a former employee of the Company who served as its Regional Sales Manager for the Midwest from January 2020 through early March 2022.  CW2 resigned in March 2022.  CW2 participated in Company-wide town hall meetings a few times per year, including one in late 2021, during which Defendants Fieldly and Negron stated that there was an SEC investigation into the Company regarding its stock price.  CW2 also said that the Company had a very small HR department.  That HR employee also performed other duties as Defendant Fieldly's personal assistant.

25.     CW3 was an executive at the Company who was employed for many years.  CW3 left the Company in 2021.  CW3 cashed in vested Celsius shares at the time of separation.  Upon cashing in shares that were vested, CW3 received far less money from the stock than had been negotiated in the separation agreement.  CW3 contacted Defendant Fieldly, who directed Defendant Negron to correct the mistake, and within 24 hours, the Company corrected the error and transferred the correct amount of funds.

26.     CW3 also stated that during one meeting in 2019 or 2020, Defendant Negron stated that he had purposefully delayed paying the Company's bills on time in order to "increase cash flow."  Defendant Fieldly was present at this meeting, as well as other executives at the vice president level and above.

27.     CW3 also described the Company's accounting department as exceedingly small, with only a few individuals employed overall.  It had "very loose accounting processes and procedures" in place. There were two women in accounting who handled all accounts nationwide, and who always had "stacks and stacks" of paperwork on their desks.  Checks that the Company paid to vendors had to be signed by Negron, but they lingered on his desk as he pursued a strategy of delayed payments.  CW3 attributed the anemic accounting department to the desire to keep costs low, so that it could elevate cash flow.  Salaries, likewise, were kept low.  Stock options were an inexpensive way to compensate employees, as they did not cost the Company any out of pocket cash at the time of the award.

28.     CW4 was employed by the Company from 2015 to March 2022, and was most recently a director of sales.  CW4 corroborated information provided by CW3, concerning

Defendant Negron's tendency to "drag[] his feet on paying people Celsius owes money to," which included vendors and customers, because "it saves interest on the money."

## THE AUDIT COMMITTEE CHARTER

29.    The Company maintains an Audit Committee Charter which went into effect on November 6, 2009, and states in relevant part that the members of the Audit Committee are responsible to ensure the accurate dissemination of all financial information to shareholders and the market.  The Audit Committee Charter provides in relevant part:

**GUIDING PRINCIPLES AND LIMITATION OF COMMITTEE'S ROLE**

The Audit Committee is dedicated to fostering a proper control structure in the Corporation, from the environment in which the controls operate to the activities that are performed on a daily basis. The Audit Committee will support management and the Corporation's internal audit function to assess, develop, implement and monitor controls over critical business processes to promote effective and efficient operations, reliable financial reporting, compliance with laws and regulations and the safeguarding of the Corporation's assets.

With regard to financial reporting, the guiding principles to be considered by the Audit Committee in carrying out its responsibilities in reviewing a particular matter shall include consideration of (1) whether the financial statements fairly present the results of operations of the Corporation in accordance with generally accepted accounting principles; (2) whether the treatment of the matter is consistent with the Corporation's practices in prior accounting periods; (3) whether the presentation of the matter is reasonably comprehensive under the circumstances; (4) whether the disclosure regarding the matter contains any material misstatement or fails to disclose a matter which reasonably would be considered material to the Corporation's stakeholders; and (5) whether the presentation varies in a material way from principles of convention or conservatism.

While the Audit Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Audit Committee to plan or conduct audits or to determine that the Corporation's financial statements and disclosures are complete and accurate and are in accordance with generally accepted accounting principles and applicable rules and regulations. These are the responsibilities of management and the independent auditor.

\*\*\*

**Committee Membership**

The Audit Committee shall consist of no fewer than three members. […]

\*\*\*

**Financial Statement and Disclosure Matters**

[] Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Corporation's Form 10-K.

[] Review and discuss with management and the independent auditor the Corporation's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

[] Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles.

[] Review and discuss quarterly reports from the independent auditors on:

(a) All critical accounting policies and practices to be used.

(b) All alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

(c) Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

[] Discuss with management the Corporation's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

[] Discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Corporation's financial statements.

[] Discuss with management the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Corporation's risk assessment and risk management policies.

[] Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the

audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

[] Ensure that a public announcement of the Corporation's receipt of an audit opinion that contains a going concern qualification is made promptly.

[] Review and discuss with management and the independent auditor the Corporation's disclosure controls and procedures.

[] Review significant new, or changes to existing, accounting, financial, external reporting and asset-safeguarding policies and practices.

***

**Compliance Oversight Responsibilities**

[] Obtain from the independent auditor assurance that Section 10A (b) of the Exchange Act has not been implicated.

[] Obtain reports from management, the Corporation's senior internal auditing executive and the independent auditor that the Corporation and its subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Corporation's Code of Conduct Advise the Board with respect to the Corporation's policies and procedures regarding compliance with applicable laws and regulations and with the Corporation's Code of Conduct.

[] To the extent required by NASDAQ rules, approve all related party transactions.

[] Establish procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

[] Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Corporation's financial statements or accounting policies.

[] Discuss with the Corporation's General Counsel legal matters that may have a material impact on the financial statements or the Corporation's compliance policies.

///
///
///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# HUMAN RESOURCES & COMPENSATION
## COMMITTEE CHARTER

30.     The Company maintains a Human Resources & Compensation Committee Charter, which went into effect on November 6, 2009, and provides in relevant part:

**Purpose**

The purpose of the Compensation Committee (the "Committee") of the Board of Directors (the "Board") of Celsius Holdings, Inc. (the "Corporation") shall be to evaluate and approve and recommend officer and director compensation arrangements, plans, policies and programs of the Corporation, and to administer the Corporation's equity-based compensation plans for employees, whether adopted prior to or after the date of adoption of this Charter.

*** 

**Responsibilities**

The following shall be the principal recurring duties of the Committee in carrying out its responsibilities. These duties are set forth as a guide with the understanding that the Committee may supplement them as appropriate and may establish policies and procedures from time to time that it deems necessary or advisable in fulfilling its responsibilities under this Charter, the Corporation's By-Laws and governing law.

[] The Committee will have the authority to determine and approve and recommend the form and amount of compensation to be paid or awarded to the Corporation's officers, including executive officers as defined under Section 16 of the Exchange Act and the rules promulgated thereunder ("*Executive Officers*"). Without limiting the foregoing, the Committee will annually review and approve the corporate goals and objectives relevant to the compensation of the Chief Executive Officer ("*CEO*") and the Corporation's other Executive Officers. The Committee shall have the authority to make decisions respecting (i) CEO and Executive Officer employment and severance contracts and arrangements, (ii) salary paid to the CEO and Executive Officers, (iii) the grant of all cash-based bonuses and equity-based compensation to the CEO and Executive Officers, (iv) the entering into or amendment or extension of any employment contract or similar arrangement with the CEO and Executive Officers, (v) any CEO and Executive Officers severance or change in control arrangement, and (vi) any other CEO and Executive Officers compensation matters as from time to time directed by the Board. The Committee shall take account of the recommendations of the Corporation's CEO for other Executive Officers with respect to each of the foregoing items. The Committee may delegate authority to subcommittees of the Committee or to Executive Officers with respect to compensation determinations for persons who are not Executive Officers.

///

[] The Committee will have the authority to determine the form and amount of cash and equity compensation to be paid or awarded to the Corporation's non-employee directors, including compensation for service on the Board or on committees of the Board.

[] The Committee will annually review and make recommendations to the Board with respect to adoption and approval of, or amendments to, all cash-based and equity-based incentive compensation plans and arrangements, and the amounts and shares reserved thereunder after taking into consideration the Corporation's strategies with respect to short and long-term cash and equity-based compensation.

[] The Committee will: (i) approve grants of stock, stock options or stock purchase rights to individuals eligible for such grants (including grants in compliance with Rule 16b-3 promulgated under the Exchange Act to Executive Officers); (ii) interpret the Corporation's equity-based compensation plans and agreements thereunder; and (iii) determine acceptable forms of consideration for stock acquired pursuant to the Corporation's equity-based incentive compensation plans. The Committee may delegate to the Corporation's Chief Executive Officer the authority to approve options to employees of the Corporation or of any subsidiary of the Corporation who are not directors of the Corporation or Executive Officers, provided that such options are to purchase fewer than 100,001 shares in any one year period, and provided further, that the price per share is no less than the fair market value of the Corporation's common stock on the date of grant.

***

[] The Committee will have the authority and right, at the expense of the Corporation, to retain and terminate compensation consultants, legal counsel and other advisors of its choosing to assist the Committee in connection with its functions. The Committee shall have the sole authority to approve the fees and other retention terms of such consultants and advisors. The Corporation shall provide for appropriate funding, as determined by the Committee, for payment of compensation to any such advisors employed by the Committee pursuant to this Charter or the commission of any necessary studies or surveys concerning the levels of executive compensation payable in the industry in which the Corporation is engaged and in other related industries and to obtain recommendations from outside consultants concerning compatible pay programs, as appropriate. […]

## NOMINATING & CORPORATE
## GOVERNANCE COMMITTEE CHARTER

31.     The Company maintains a Nominating & Corporate Governance Committee Charter which went into effect on November 6, 2009, and provides in relevant part:

///

**[] PURPOSE OF THE COMMITTEE**

The purposes of the Nominating and Corporate Governance Committee (the "Committee") of the Board of Directors (the "Board") of Celsius Holdings, Inc. (the "Company") shall be to recommend to the Board individuals qualified to serve as directors of the Company and on committees of the Board; to advise the Board with respect to the Board composition, procedures and committees; to develop and recommend to the Board a set of corporate governance principles applicable to the Company; and to oversee the evaluation of the Board and the Company's management.

\*\*\*

**[] DUTIES OF THE COMMITTEE**

\*\*\*

**Corporate Governance**

The following shall be the goals and responsibilities of the Committee with respect to corporate governance:

  (a)  To develop and review periodically, and at least annually, the corporate governance principles adopted by the Board to assure that they are appropriate for the Company and comply with the requirements of the NASDAQ, and to recommend any desirable changes to the Board.

  (b)  To consider any other corporate governance issues that arise from time to time, and to develop appropriate recommendations for the Board.

## BACKGROUND

41.    The Company develops, markets and sells functional drinks and liquid supplements.

42.    In recent years, the Company has become an increasingly popular choice of energy drink, competing with established brands such as Monster and Red Bull.

**The Company's Increase In Revenue**

43.    On May 13, 2021, the Company held its earnings call for the first quarter of fiscal year ("FY") 2021 during which Defendant Fieldly promoted that the Company "achieved a record first quarter exceeding $50 million in sales, which were derived by over 100% growth in North America sales from continued strong demand for our portfolio, and a 25% growth in international

///

sales." The Company's $50 million in revenues were a significant increase over the $28 million in revenues it had achieved in the same quarter of 2020.

44.     On August 12, 2021, the Company reported its financial results for the second quarter of FY 2021, which also exhibited significant growth in revenue: $65 million compared to $30 million for the same quarter in 2020.

45.     However, unlike in the first quarter, in the second quarter of 2021, the Company was able to report a large increase in net income: $3.96 million as compared to $1.2 million in the same quarter of 2020.  The $3.96 million figure later proved to be false.

46.     The market reacted positively to the Company's falsely reported second quarter financial results over the subsequent weeks, with the Company's share price increasing by 24%, from $73.32 on August 12, 2021, to $96.24 on September 16, 2021.

47.     By the beginning of November 2021, the Company's stock was above $100 per share and on November 5, 2021, the Company's share price hit a high of $108.07.

48.     Defendants boasted about the Company's profit margins and reassured by analyst coverage – began pumping millions of dollars into the Company throughout FY 2021.  For instance, on November 1, 2021, Buy Sell Signals reported that institutional shareholders invested more in the Company in FY 2021 than they had in FY 2020.  In the third quarter of FY 2020, institutional shareholders held $876.5 million of Company common stock; in the fourth quarter of FY 2020 $1.4 billion; in the first quarter of FY 2021 $2.2 billion; and in the second quarter of FY 2021 $2.33 billion.

49.     Buy Sell Signals further reported that in the first quarter of FY 2021, 59 institutional shareholders increased their holdings in Celsius and in the second quarter of FY 2021, 87 institutional investors increased their holdings of Celsius.  Among those who increased their holdings in Celsius in the second quarter of FY 2021 were: Blackrock, which increased its position by 1,560,394 shares, Vanguard Group by 1,191,768 shares, Voya Investment Management by 677,914 shares, and Wellington Management Group by 387,140 shares.

///

///

**The Company's Increase Revenue in Third Quarter 2021**

50.     On November 11, 2021, the Company reported $94.9 million in revenue, as compared to $36.5 million in the same quarter of 2020.  However, its net income fell from $4.75 million in 2020 to $2.75 million in 2021.  But even the reported $2.75 million figure proved to be false; net income was actually negative $9.4 million for this quarter.

51.     The Company attributed the disappointing net income to increased costs associated with aluminum supply chain issues.  It was on this news that the Company's stock dropped from $97.77 on November 11, 2021 to $77.77 two trading days later, on November 15, 2022.

52.     Analysts were similarly unimpressed by the Company's relatively disappointing net income and net income per share.  The Company thus faced pressure from analysts and investors to keep its expenses low, and in turn, prop up its net income (profit) and net income (profit) per share.

53.     Concerned that revenue was not a good marker of the Company's performance, many analysts looked to the Company's net income and net income per share as a better indication of how it was performing.

54.     For instance, on March 5, 2021, Validea, an online independent research provider that creates reports on publicly traded companies by using quantitative strategies of some well-known investors, issued a report discussing the Company's profit margins.  According to Validea's profit margin methodology, a company "with a minimum trailing 12 month after tax profit margin of 7%" is deemed to "pass," and a "pass" means that the company has "strong positions in their respective industries and offer greater shareholder returns."

55.     On March 5, 2021, Validea issued a report that rated the Company's 4.77% profit margin as a "FAIL."

56.     On April 6, 2021 – just one week after the Company released its first quarter earnings for FY 2021 – Credit Suisse also expressed concern about the Company's profit margins, particularly in light of a global aluminum can shortage, which further tightened the margins. Credit Suisse stated: "Gross margin is already at a good level, though we expect a decline in 2021

due to costs associated with the importation of aluminum cans and higher freight expenses. SG&A expenses, however, appear high, even for a company this size and in this stage of growth."  Credit Suisse further cautioned that "Celsius has operated at a loss for most of its recent history" and that Celsius had only just "turned an operating profit for the first time in 2020 – a 6% margin vs. negative double-digit in previous years."

57.    On May 21, 2021, Yahoo Finance held an interview with Defendant Fieldly during which Brian Sozzi, an analyst for Yahoo Finance, voiced concerns about the Company's climbing expenses negatively affecting the Company's margins.  Mr. Sozzi asked Defendant Fieldly: "And John, in the first quarter, you know, just looking at the margins, margins did take a hit.  And you call that higher input costs.  The can shortage the industry is experiencing – can you get enough cans right now to make your product?  And then have you raised prices?" Defendant Fieldly responded: "We have been affected.  There is a can shortage.  There's a can pandemic out there right now, especially in the beverage industry.  We're importing cans from around the world.  We started, actually, this process back in Q4, a little bit ahead of the curve.  We started importing cans back in March.  So our margins were impacted."

58.    On September 17, 2021, Validea once again reported that the Company's profit margin of 5.84% was a "FAIL."

59.    On November 11, 2021, Maxim, an analyst group that regularly covers the Company, released a report with the following headline: "3Q21 Revenue Beats Significantly as Distribution Gains Accelerate Growth, but GM and EPS Lower – Maintain Hold on Valuation." In the report, Maxim was bullish on revenue, but bearish on net income per share (which Maxim refers to as "EPS"), stating: "Based on 3Q21 results and our expectations, we are significantly increasing our 2021-2023 revenue estimates, while lowering our 2021-2023 GM and GAAP EPS estimates." The Maxim report further stated: "gross margin of 39.7% was below our at-consensus estimate of 44.0% due to higher supply-chain costs, as well as the company's transition to six warehouses . . . .  On lower margins and higher opex, GAAP EPS of $0.04 was below both our estimate of $0.08 and consensus of $0.07."

///

**Defendant Fieldly Insider Sales**

60.     Defendant Fieldly sold a substantial amount of Company common stock pursuant to a trading plan he entered into during the Relevant Period.

61.     On November 30, 2021, Defendant Fieldly executed a 10b5-1 trading plan, which is a written plan for trading securities designed in accordance with Rule 10b5-1(c) of the Securities Exchange Act of 1934.  10b5-1 plans are used by insiders as affirmative defenses against allegations that they traded company stock while in possession of material non-public information.  The timing of Defendant Fieldly's 10b5-1 plan initiation, nine years after he joined the Company and four months into the Relevant Period, is highly suspicious.

62.     Immediately following execution of the 10b5-1 plan, Defendant Fieldly sold 20,000 shares of Company common stock pursuant to the plan on December 27, 2021 for gross proceeds of $1.5 million.

**The Company Compensates Employees
and Directors with Share-Based Compensation**

63.     The Company compensates its employees at all levels and directors with non-cash share-based compensation.   According to CW3, upon information and belief, share-based compensation was an inexpensive way for the Company to compensate its employees.

64.     The Company began compensating employees with share-based compensation on January 18, 2007, when it adopted its "2006 Incentive Stock Plan." According to the Company's proxy statement for FY 2022, the Incentive Stock Plan was:

> [I]ntended to provide incentives which will attract and retain highly competent persons at all levels as employees of the Company, as well as independent contractors providing consulting or advisory services to the Company, by providing them opportunities to acquire the Company's common stock or receive monetary payments based on the value of such shares pursuant to Awards issued. While the plan terminates 10 years after the adoption date, issued options have their own schedule of termination.

65.     The Amended 2006 Incentive Stock Plan further stated:

> Equity incentives may be in the form of stock options with an exercise price not less than the fair market value of the underlying shares as determined pursuant to the Amended 2006 Incentive Stock Plan, stock appreciation rights, restricted stock awards, stock bonus awards, other stock-based awards, or any combination of the

foregoing. The Amended 2006 Incentive Stock Plan is administered by our Human Resource and Compensation Committee. Options to purchase 245,000 shares of common stock are outstanding under the 2006 Amended 2006 Incentive Stock Plan as of the date of this Report.  The Amended 2006 Incentive Stock Plan (but not awards thereunder) expired in January 2017.

66.    The Company's Amended 2006 Incentive Stock Plan (but not awards) expired in January 2017.

67.    On April 30, 2015, the Company adopted its 2015 Stock Incentive Plan ("2015 Plan") which stated:

The 2015 Plan permits the grant of options and shares for up to 5,000,000 shares. In addition, there is a provision for an annual increase of 15% to the shares included under the plan, with the shares to be added on the first day of each calendar year, beginning on January 1, 2016.

68.    In its proxy statement for FY 2022, the Company further stated:

There are 7,041,493 shares of our common stock are currently reserved for issuance pursuant to the exercise of awards under the 2015 Incentive Stock Plan. The number of shares so reserved automatically adjusts upward on January 1 of each year, so that the number of shares covered by the 2015 Incentive Stock Plan is equal to 15% of our then issued and outstanding common stock. Stock option and awards to purchase an aggregate of 5,019,646 shares of our common stock are outstanding under the 2015 Incentive Stock Plan as of the date of this Report.

69.    The Company's Incentive Stock Plan is administered by the Company's Human Resource and Compensation Committee, which is headed by Board members Russell, Kravitz, Castaldo and Ruberti.

70.    According to the Company's Form 10-Q for the third quarter of FY 2021, filed with the SEC on September 30, 2021:

Under the 2015 Stock Incentive Plan, the Company has issued options to purchase approximately 4.0 million shares at an average price of $7.13 with a fair value of approximately $3.29 million. For the nine months ended September 30, 2021 and 2020, the Company issued options to purchase 304,750 and 495,274 shares, respectively.  Upon exercise, shares of new common stock are issued by the Company.

71.    The Company also compensates its employees and directors with restricted stock units ("RSUs").  According to the Company's 10-K for FY 2021, filed with the SEC on March 16, 2022:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17

Restricted stock units are awards that give the holder the right to receive one share of common stock for each restricted stock unit upon meeting service-based vesting conditions (typically annual vesting in three equal annual installments, with a requirement that the holder remains in the continuous employment of the Company).   The holders of unvested units do not have the same rights as stockholders including but not limited to any dividends which may be declared by the Company, and do not have the right to vote. The value of restricted stock units that vest over time is established by the market price on the date of its grant.

**The Company Accounts for Share-Based Compensation**
**Expenses in Accordance with the FASB's ASC 718**

72.     Equity awards are part of compensation and must follow specific accounting rules. When the Company first adopted its Incentive Stock Plan in 2006, in order to remain GAAP compliant, it also needed to adopt the provisions of Accounting Standards Codification Topic 718 "Compensation – Stock Compensation" ("ASC 718"), which it did on January 1, 2006.   In accordance with FASB's ASC Topic 718, the Company measures share-based compensation payments "on the date of grant at the fair value of the share-based payments."

73.     ASC Topic 718, promulgated by the Financial Accounting Standards Board ("FASB"), provides corporations guidance on how to properly expense employee share-based compensation on a corporate income statement. The overarching principle of ASC 718 is to account for the fair value of employee awards as compensation expense in the financial statements.

74.     Thus, consistent with ASC 718, the Company measures share-based compensation costs "on the date of grant at the fair value of the share-based payments" and "[s]uch compensation amounts, if any, are amortized over the respective vesting periods of the grants." In other words, stock option compensation expenses are supposed to be calculated and recognized on a company's income statement using the fair market value of the stock as of the date of termination or retirement of an employee.

75.     Here, the Company's share-based compensation awards were "modified" when nine employees were terminated or resigned from the Company in the second and third quarters of FY 2021, and their stock-based compensation vesting schedule was accelerated.  To account
///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for the expenses associated with this "modification," accountants look to ASC 718-20-55-108, which states:

> [I]f at the date of modification awards are not expected to vest under the original vesting conditions, an entity should recognize compensation cost only if the awards vest under the modified vesting conditions. Said differently, if the entity believes that the original performance or service vesting condition is not probable of achievement at the date of the modification, the cumulative compensation cost related to the modified award, assuming vesting occurs under the modified performance or service vesting condition, is the modified award's fair value at the date of the modification.

76.   Defendant Negron characterized the mistake as a "type III" error in interpretation. ASC 718 defines Type III as an "improbable to probable modification," meaning that the "original performance or service vesting condition" was "not probable of achievement at the date of modification," but the modified performance, *i.e.*, no future service at all, was "probable of achievement at the date of modification."  The modification in the awards transformed the service conditions from "improbable" to "probable."

77.   ASC 718 provides examples of how to account for the Type III modification. ASC 718-20-55-121 specifically addresses the situation where employees are terminated and the stock grantor decides to accelerate vesting of all options.  It clearly spells out that the "grant date" of the accelerated options, for purposes of accounting for cost, is the date of modification. There is no room for "interpretation":  The Company should have recognized costs associated with the accelerated vested stock-based compensation when it accelerated the vesting schedule.

78.   According to Deloitte, FASB's amendments to ASC Topic 718: "simplifie[d] the accounting for share-based payment arrangements with nonemployees."  The "ASU was issued as part of the FASB's simplification initiative, which is intended to reduce the cost and complexity of current U.S.  GAAP while maintaining or enhancing the usefulness of the related financial statement information."   The new requirements pertaining to expensing share-based compensation as set forth by the FASB were not difficult or cumbersome to properly implement.

///

///

///

**Despite That ASC 718 Is Unambiguous,**
**The Company Improperly Accounted for**
**SBA of Nine Former Employees and Directors**

79.     In 2021, nine employees and members of the Board were terminated. Each of these nine individuals had participated in the Company's share-based compensation program and had unvested RSUs or ISOs at the time of their termination.  Pursuant to Board resolutions or severance agreements, the Company was required to accelerate the vesting conditions of these share-based awards. Thus, when the former directors and employees left the Company, the Company accelerated the vesting conditions of their share-based compensation awards, a practice that the Company dubbed a "Type III modification" pursuant to ASC 718. A Type III modification requires re-valuing the unvested awards at their fair market value as of the date of the modification.

80.     Thus, under ASC 718, when the Company accelerated the vesting conditions of these awards, it was supposed to value the RSUs and ISOs at the then-current fair market value of the Company's stock, and recognize such share-based compensation expenses in the second and third quarters of FY 2021 accordingly. However, by the second quarter of FY 2021, the Company's stock price was steadily climbing, hitting a high of $81 per share in early June 2021. Defendants Fieldly and Negron – both CPAs with significant CFO experience – knew that properly valuing these share-based compensation expenses in accordance with ASC 718 meant that general and administrative expenses for those two quarters would substantially increase, turning what they had hoped would be a net profit for those two quarters, into a net loss. Further, accelerating the vesting conditions of share-based compensation awards upon termination of employees and directors had been a standard practice at the Company for years.  Indeed, the Company's 2006 Amended Stock Option Plan contemplates that stock options will be vested on an accelerated schedule in certain circumstances: "Awards under the Plan may also be subject to such other provisions . . . including . . . provisions for the acceleration of the right to exercise or vesting of awards . . ."

81.     Stock options and restricted stock units awarded to employees and directors are forms of share-based compensation that the Company recognizes as a non-cash expense on its

income statements.  The Company classifies this noncash share-based compensation as "general and administrative expenses" ("G&A") on its income statements.

82.     As a result, the Company's general and administrative expenses for the second and third quarters of FY 2021 were substantially undervalued at $9.12 million and $11.14 million, respectively.  In turn, Defendants were able to report a positive net income for the second and third quarters, when in fact, cumulative income for those two quarters on a year-to-date basis was actually a net loss of $8.01 million.  On a quarterly basis, the Company overstated net income as $4 million, or net income per share as $0.05 for the second quarter of FY 2021; and the Company overstated net income as $2.75 million, or net income per share as $0.04 for the third quarter of FY 2021.

## **THE TRUTH IS DISCLOSED**

83.     On March 1, 2022, the Company disclosed that it could not timely file its 2021 annual report due to "staffing limitations, unanticipated delays and identified material errors in previous filings."  The Company "determined that the calculation and expense of noncash share-based compensation, related to grants of stock options and restricted stock units awarded to certain former employees and retired directors were materially understated for the three and six month periods ended June 30, 2021 and three and nine month periods ended September 30, 2021." As a result, management concluded that there was a material weakness in the Company's internal controls over financial reporting.

84.     In a Form 8-K filed with the SEC on March 1, 2022, the Company stated that it would restate its previously issued financial statements for the periods ended June 30, 2021 and September 30, 2021.  The Company stated:

> In connection with the preparation of its consolidated financial statements for the year ended December 31, 2021, the Company determined that the calculation of expense of non-cash share based compensation related to grants of stock options and restricted units ("RSUs") issued to former employees and retired directors was materially understated during the three-and six-month periods ended June 30, 2021 and three- and nine-month periods ended September 30, 2021 (the "Affected Periods"), based on the application of U.S. generally accepted accounting principles. During the Affected Periods, the stock options and RSUs were modified and the expense should have been calculated and recognized using the fair market value of the awards as of the date of modification and recognized over the remaining service period.

85.     The Company expected to record share-based compensation expense of $3.18 million for second quarter of FY 2021, resulting in net income of $779,991, and of $12.116 million for the third quarter of FY 2021, resulting in a net loss of $9.4 million, as displayed in the chart below:

| | Three Months Ended June 30, 2021 | | |
|---|---|---|---|
| | As Reported | Adjustments | As Restated |
| General and administrative expenses | $ 9,119,532 | $ 3,180,353 | $ 12,299,885 |
| Total operating expense | 24,650,520 | 3,180,353 | 27,830,873 |
| Income (loss) from operations | 3,598,849 | (3,180,353) | 418,496 |
| Net income (loss) before income taxes | 3,960,344 | (3,180,353) | 779,991 |
| Net income (loss) | $ 3,960,344 | $ (3,180,353) | $ 779,991 |
| Net income (loss) per share: | | | |
| Basic | $ 0.05 | $ (0.04) | $ 0.01 |
| Diluted | $ 0.05 | $ (0.04) | $ 0.01 |

| | Three Months Ended September 30, 2021 | | |
|---|---|---|---|
| | As Reported | Adjustments | As Restated |
| General and administrative expenses | $ 11,140,030 | $ 12,116,438 | $ 23,256,468 |
| Total operating expense | 33,761,092 | 12,116,438 | 45,877,530 |
| Income (loss) from operations | 3,932,280 | (12,116,438) | (8,184,158) |
| Net income (loss) before income taxes | 3,579,610 | (12,116,438) | (8,536,828) |
| Net income (loss) | $ 2,745,791 | $ (12,116,438) | $ (9,370,647) |
| Net income (loss) per share: | | | |
| Basic | $ 0.04 | $ (0.17) | $ (0.13) |
| Diluted | $ 0.03 | $ (0.15) | $ (0.12) |

86.     On March 1, 2022, the Company held its earnings call for the fourth quarter of FY 2021 during which Defendant Fieldly explained:

In addition, we have had multiple open positions, and we have been vigorously recruiting top talent into the company's finance area to support our operations and our strong growth in our business, which was impacted by our ability to finalize the Ernst & Young first full year audit. We filed for an extension on our Form 10-K with the SEC earlier this evening and expect to file our 10-K during the 15 calendar day extension period as of the final audit and internal control procedure work are performed and completed.

We have been able to finalize the majority of the pending items prior to our call today, including as reported today in an 8-K filing, and a prior period error correction has been made to the noncash stock expense in our second and third quarter financial results for 2021 totaling approximately $2.7 million and $12.6

million in additional noncash stock expense for those periods, which was the results of prior stock grants that were awarded to foundational individuals, which were modified to allow for continual vesting past their contracted service dates.

This was an error of interpretation of a Class III modification rule, technical rule, which resulted in an immediate mark-to-market adjustments for the prior periods' stock grants as a non-cash expense. We highlighted this financial impact in our full year updated totals on our flash results table at the beginning of our earnings supplement as well as the financial statements on the earnings supplement included in the 8-K filing today, which outlines the prior period of changes reflected in the non-cash stock expense for those periods.

In addition, in light of this error, our management has then concluded that a material weakness existed in the Company's internal controls of our financial reporting for the Company's disclosure controls and procedures, which were not effected as of December 31, 2021, which was disclosed in our 8-K filing earlier today and which will be further discussed in our upcoming filing.

87.     During the same earnings call, Defendant Negron stated:

I wanted to start by providing additional clarity on the adjustments that John highlighted regarding the noncash stock compensation expense. During Q2 and Q3, the company calculated and recognized non-cash stock-based compensation expense related to options and RSUs held by former foundational employees and retired directors ratably over their vesting period.  However, because the options and the RSUs were allowed to continue to pass after the employees separated and the directors retired from the company, those awards were deemed to have been modified. And the expense should have been calculated and recognized using the firm market value of the stock as of the date of termination or retirement.

This led to the adjustments that John discussed, which resulted in the understatement of the stock compensation expense in Q2 in the amount of $3.1 million and $12.1 million for Q3. These aspects are further detailed in the 8-K that we filed today.

As a result of this situation, the company's management and the Audit Committee of its Board of Directors have determined that the company's previously issued interim unaudited financial statements contained in the company's quarterly reports on Form 10-Q for each of the affected quarters should no longer be relied upon. The company's management has also concluded that in light of this situation, as previously described, a material weakness existed in the company's internal control over the proper valuation of stock compensation expense regarding the modifications performed to stock awards for some former employees and retired directors.

88.     On March 1, 2022, the Company also held an earnings call for its fourth quarter earnings for fiscal year 2021, during which Mark Stiefel Astrachan, an analyst for Stifel, Nicolaus & Co., asked Defendant Negron whether the SEC investigation is related to the Company's failure to properly report employee share-based compensation. Defendant Negron responded: "I'm not

1   sure as it relates to that, not necessarily.  It's more of a situation that happened regarding some of

2   the awards that had to be properly valued at fair market value for some of these employees that

3   were separated and some of the Board members that also retired." Defendant Fieldly added: "And

4   I'll just chime in, in regards to some of the employees, it was also – it's a technical aspect there

5   because some of them are still providing services through contractual services. So there was just

6   a technicality. That was an error in interpretation there on those stock awards. So it was definitely

7   an oversight and a correction that was noted."

8          89.     On this news, the Company's stock price dropped to an intra-day low of $56.21

9   per share from a high of $65 per share on unusually heavy trading volume on March 2, 2022.

10   Over the course of the March 2, 2022 and March 3, 2022 trading sessions, the Company's stock

11   price dropped a total of $5.20, or 8.3% on unusually heavy trading volume to close at $57.60 per

12   share on March 3, 2022.

13          90.     The Company officially restated its financial statements on page F-26 of its Form

14   10-K filed with the SEC on March 16, 2022.  The Company explained that "[s]ubsequent to filing

15   the Company's Quarterly Reports on Form 10-Q for the periods ended June 30, 2021 and

16   September 30, 2021, the Company determined that certain amounts reported in the Company's

17   previously issued unaudited consolidated statements of operations and comprehensive income

18   (loss) and consolidated balance sheets contained misstatements. . . .  In accordance with Staff

19   Accounting Bulletin No. 99, Materiality, management evaluated the materiality of the

20   misstatements from a qualitative and quantitative perspective and concluded that the

21   misstatements were material to the three-and six-months ended June 30, 2021 and the three- and

22   nine-months ended September 30, 2021, respectively."

23          91.     Accordingly, the Company restated its consolidated financial statements for the

24   three- and six-months ended June 30, 2021, and three- and nine- months ended September 30,

25   2021 as follows: net income for the second quarter of FY 2021 was actually $779,991, not $3.96

26   million, as initially reported; and net income for the third quarter of FY 2021 was actually

27   negative net income of $9.4 million, not $2.75 million as initially reported:

28   ///

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

There were certain Board of Directors members and employees whose service was terminated during the year. In connection with their terminations, the vesting conditions of the previously granted awards were modified to accelerate the vesting of specified un-vested awards pursuant to Board resolutions or severance agreements. Pursuant ASC 718, these were Type III modifications requiring re-evaluation of un-vested awards to modification date fair value with recognition of compensation expense over the remaining service period. The Company modified awards for nine grantees resulting in approximately $19.3 million in incremental compensation cost during the year ended December 31, 2021.

## **MATERIALLY FALSE STATEMENTS**

### **The Company's Second and Third Quarter Financials Were False**

92.     The Company materially understated its general and administrative expenses, and its total operating expenses for the second and third quarters of FY 2021.  The Company materially overstated its net income and its net income per share for those quarters.  As more specifically described below, these false statements appeared in the Company's Forms 8-K filed on August 12, 2021 and on November 11, 2021, as well as its Forms 10-Q filed on those same dates.  Defendants Fieldly and Negron signed all of these public filings which contained the false metrics.As further detailed below, Defendants Fieldly and Negron repeated these false metrics during analyst calls and other investor presentations during the Relevant Period.

93.     A summary of the false financial metrics that Celsius reported in its second earnings report – as reported in its Form 8-K filed on August 12, 2021 and its Form 10-Q filed on August 12, 2021 – and in its third quarter earnings reports – as reported in its Form 8-K filed on November 11, 2021, and its Form 10-Q filed on November 11, 2021 – is as follows for the particular quarters:

| 2Q 2021 Reported | 2Q2021 Actual | 2Q2021 Difference | 3Q2021 Reported | 3Q2021 Actual | 3Q2021 Difference |
|---|---|---|---|---|---|
| **Net Income ($)** | | | | | |
| 3,960,344 | 779,991 | -80% | 2,745,791 | (9,370,647) | -441% |
| **Net Income Per Share ($)** | | | | | |
| 0.05 | 0.01 | -80% | 0.04 | (0.13) | -425% |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

25

| General and Administrative Expenses ($) | | | | | |
|---|---|---|---|---|---|
| 9,119,532 | 12,299,885 | 35% | 11,140,030 | 23,256,468 | 109% |

| Total Operating Expenses ($) | | | | | |
|---|---|---|---|---|---|
| 24,650,520 | 27,830,873 | 13% | 33,761,092 | 45,877,530 | 36% |

| Six Months Ended June 30, 2021 Reported | Six Months Ended June 30, 2021 Actual | Six Months Ended June 30, 2021 Difference | Nine Months Ended Sept. 30, 2021 Reported | Nine Months Ended Sept. 30, 2021 3Q2021 Actual | Nine Months Ended Sept. 30, 2021 Difference |
|---|---|---|---|---|---|
| Net Income ($) | | | | | |
| 4,545,768 | 1,365,415 | -70% | 7,251,559 | (8,005,232) | -210% |
| Net Income Per Share ($) | | | | | |
| 0.06 | 0.02 | -67% | 0.10 | (0.11) | -210% |
| General and Administrative Expenses ($) | | | | | |
| 16,926,198 | 20,106,551 | 19% | 28,066,228 | 43,363,019 | 55% |
| Total Operating Expenses ($) | | | | | |
| 44,416,239 | 47,596,592 | 7% | 78,177,331 | 93,474,122 | 20% |

94.     Below is a chart that displays each restated amount as a percentage of quarterly revenue:

///

| 2Q 2021 Reported | 2Q2021 Actual | 2Q2021 Revenue | 2Q2021 % Difference in Revenue | 3Q2021 Reported | 3Q2021 Actual | 3Q 2021 Revenue | 3Q2021 % Difference in Revenue |
|---|---|---|---|---|---|---|---|
| **Net Income ($)** | | | | | | | |
| 3,960,344 | 779,991 | 65,073,323 | 4.9% | 2,745,791 | (9,370,647) | 94,909,100 | 12.8% |
| **General and Administrative Expenses ($)** | | | | | | | |
| 9,119,532 | 12,229,885 | 65,073,323 | 4.9% | 11,140,030 | 23,256,468 | 94,909,100 | 12.8% |
| **Total Operating Expenses ($)** | | | | | | | |
| 24,650,520 | 27,830,873 | 65,073,323 | 4.9% | 33,761,092 | 45,877,530 | 94,909,100 | 12.8% |

95.     The adjustments in net income, general and administrative expenses, and total operating expenses accounted for approximately 5% of reported revenues for the second quarter of FY 2021, and 12.8% of reported revenues for the third quarter of FY 2021.

**False Metrics Pertaining to the Company's Second Quarter in 2021**

96.     On August 12, 2021, the Company released its results for the second quarter of 2021 in a Form 8-K.  It reported net income of $3.9 million for the second quarter of FY 2021. This was false because when the Company accounted for its share-based compensation expenses properly, net income for the second quarter of FY 2021 was actually $779,991, a decline of 80%.

97.     In the same earnings release, the Company reported net income of share of $0.05. This was false because when the Company accounted for its share-based compensation expenses properly, net income per share was actually $0.01, a decline of 80%.

98.     The Company also filed with the SEC its Form 10-Q for the three month period ended June 30, 2021 on August 21, 2021. That SEC filing included the following false metrics:

(a)     Net income was reported as $3.9 million, but when its share based compensation was properly accounted for, this figure dropped to $779,991.

(b)     Net income per share was reported as $0.05, but when its share based compensation was properly accounted for, this figure dropped to $0.01.

*///*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27

(c)     General and administrative expenses were reported as $9.1 million, but when its share based compensation was properly accounted for, this figure rose to $12.3 million.

(d)     Total operating expenses were reported as $24.7 million, but when its share based compensation was properly accounted for, this figure rose to $27.8 million.

99.     The Form 10-Q filed on August 21, 2021 also included false metrics for the six-month period ended June 30, 2021, as follows:

(a)     Net income was reported as $4.5 million, but when its share based compensation was properly accounted for, this figure dropped to $1.4 million.

(b)     Net income per share was reported as $0.06, but when its share based compensation was properly accounted for, this figure dropped to $0.02.

(c)     General and administrative expenses were reported as $16.9 million, but when its share based compensation was properly accounted for, this figure rose to $20.1 million.

(d)     Total operating expenses were reported as $44.4 million, but when its share based compensation was properly accounted for, this figure rose to $47.6 million.

100.     The Company also held its second quarter earnings call for fiscal year end 2021 on August 12, 2021, during which Defendant Negron stated:

General and administrative expenses for the three months ended June 30, 2021 were $9.1 million, an increase of $5.2 million or 133% from $3.9 million for the three months ended June 30, 2020. This increase was primarily attributable to stock option expense, which amounted to $4 million for the three months ended June 30, 2021, or an increase of $2.8 million, which accounts for 51.9% of the total increase in this area when compared to the prior year quarter. Management deems it very important to motivate employees by providing them ownership in the business in order to promote overperformance.  Additionally employee cost for the three months ended June 30, 2021 reflect an increase of $670,000 or 61%, as investments in this area are also required to properly support our higher business volume and the commercial and operational areas of the business. Additionally, travel and other similar expenses are now being incurred.

101.     This statement was false.  When the Company accounted for expenses associated with its share-based compensation properly, general and administrative expenses for the three months ended June 30, 2021 were $12.3 million, not $9.1 million, an increase of 35%.  When the

Company accounted for expenses associated with its share-based compensation properly, its stock option expenses were actually $7.18 million for the three months ended June 30, 2021 (and not $4 million, as reported), which was an increase of $5.98 million (and not $2.8 million, as reported).

102.    During the same earnings call, Defendant Negron stated: "As a result of the above, the net income for the three months ended June 30, 2021 was $3.9 million or $0.05 per share on a weighted average of 73.2 million shares outstanding and dilutive earnings of $0.05 per share based on a fully diluted weighted average of 77.2 million shares outstanding."

103.    This statement was false. At this time, when the Company accounted for expenses associated with its share-based compensation properly, net income for the three months ended June 30, 2021 was actually $779,991, not $3.9 million, and net income per share was actually $0.01, not $0.05.

104.    The Form 10-Q for the three months ended June 30, 2021, further reported how much the Company had recognized in non-cash compensation expense for that period:

> For the six months ended June 30, 2021 and 2020, the Company recognized approximately $4.0 million and $2.6 million, respectively, of non-cash compensation expense (included in general and administrative expense in the accompanying consolidated statements of operations and comprehensive income) . . . ."

105.    This statement was false.  At the time this statement was made, the Company's non-cash compensation expense for the six months ended June 30, 2021 was understated by $3.18 million and therefore was actually $7.18 million.

106.    On August 19, 2021, the Company held its annual shareholder meeting in Boca Raton during which Defendant Fieldly stated:

> In addition, we continue to deliver gross profits of $48.8 million, up 88%. Margins as we indicated were impacted due to COVID constraints of importing of cans, raw materials.  We've [sic] also have set a path forward as we continue to grow and scale as we continue to improve our gross profits. In addition, we delivered net income of $4.5 million and adjusted EBITDA through the period of 12.9, which is 139% increase.

107.    Also, during the August 19, 2021 annual shareholder meeting, Defendant Negron stated:

In terms of financial snapshot or some of the highlights, obviously in Q1, $65.1 million of revenue, company record and then the break out between the different regions as well. And obviously here, you can see in the U.S. with a 100 – almost a 160% growth, which from my standpoint is stellar.  We had some pretty good solid growth as well, international 25% mainly through Europe. Again, you see the good gross profit profile that we're having.  And then when you look at EBITDA for the quarter basically at $8 million, that translates to about 12% of revenue which is a fairly respectable. And that's despite the fact that we had to book a couple of charges there to make sure that we have good reserves in terms of the fact that we server.  And then, obviously, that translates to about $4 million of net income or 4.5 for the year.

108.    The statements above were false because when the Company accounted for expenses associated with its share-based compensation properly, net income for the six months ended June 30, 2021 was actually $1.37 million, not $4.5 million, a decline of 70%.

109.    During the 2021 Annual Shareholders' Meeting on August 19, 2021, management gave a presentation highlighting key business results.  The presentation stated that for the six-month period ended June 30, 2021, the Company had "net income of $4.5 million compared to a net income of $2.1 million in the 2020 period."   The presentation also featured the following chart:

'''

| Flash Financials $(000)'s | 2Q 2021 | 2Q 2020 | % Change | 6M FY 2021 | 6M FY 2020 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $65.1 | $30.0 | 117% | $115.1 | $58.2 | 98% |
| N. America | $53.6 | $20.8 | 157% | $92.6 | $40.2 | 130% |
| International | $11.5 | $9.2 | 25% | $22.5 | $18.0 | 25% |
| Gross Margin % (GM ex. Freight) | 43.4% (51.8%) | 43.3% (50.5%) | 10 BPS (130 BPS) | 42.4% (50.8%) | 44.7% (51.9%) | -230 BPS (-110 BPS) |
| EBITDA* | $7.9 | $2.6 | 204% | $12.9 | $5.4 | 139% |
| Income | $4.0 | $1.6 | 150% | $4.5 | $2.1 | 114% |

110.    These statements issued in the management presentation were materially false. Net income for the six month period ended June 30, 2021 was actually $1.4 million, not $4.5 million and net income for the second quarter of FY 2021 was actually $779,991, not $4.0 million, as displayed in the above chart.

**False Metrics Pertaining to the Company's Third Quarter in 2021**

111.    On November 11, 2021, the Company released its results for the third quarter of 2021 in a Form 8-K.  It reported net income of $2.7 million for the third quarter of FY 2021.  This was false, because when the Company accounted for its share-based compensation expenses properly, net income for the third quarter of FY 2021 was actually a net loss of $9.4 million, a decline of 441%.

112.    In the same earnings release, the Company reported net income per share of $0.04. This was false because when the Company accounted for its share-based compensation expenses properly, net income per share for the third quarter of 2021 was actually negative $0.13.

113.    The Company also filed with the SEC its Form 10-Q for the three month period ended September 30, 2021 on November 11, 2021.  That SEC filing included the following false metrics:

(a)    Net income was reported as $2.7 million, but when its share based compensation was properly accounted for, this figure dropped to a net loss of $9.4 million.

(b)    Net income per share was reported as $0.04, but when its share based compensation was properly accounted for, this figure dropped to negative $0.13.

(c)    General and administrative expenses were reported as $11.1 million, but when its share based compensation was properly accounted for, this figure rose to $23.3 million.

(d)    Total operating expenses were reported as $33.8 million, but when its share based compensation was properly accounted for, this figure rose to $45.9 million.

114.    The Form 10-Q filed on November 11, 2021 also included false metrics for the nine-month period ended September 30, 2021, as follow:

(a)    Net income was reported as $7.3 million, but when its share based compensation was properly accounted for, this figure dropped to a net loss of $8.01 million.

(b)    Net income per share was reported as $0.10, but when its share based compensation was properly accounted for, this figure dropped to negative $0.11.

(c)      General and administrative expenses were reported as $28.07 million, but when its share based compensation was properly accounted for, this figure rose to $43.4 million.

(d)      Total operating expenses were reported as $78.2 million, but when its share based compensation was properly accounted for, this figure rose to $93.5 million.

115.    On November 11, 2021, the Company announced its third quarter 2021 financial results in a Form 8-K and an earnings call.  The press release stated: "[n]et [i]ncome of $2.7 million, down 44% from $4.8 million in the year ago quarter." The press release also stated that for the nine months ended September 30, 2021, Celsius had "net income of $7.3 million compared to a net income of $6.9 million in the 2020 period."  The press release included the following tables:

| Flash Financials $(000)'s* | 3Q 2021 | 3Q 2020 | % Change | 9M FY 2021 | 9M FY 2020 | % Change |
|---|---|---|---|---|---|---|
| Revenue | $94.9 | $36.8 | 157% | $210.0 | $95.1 | 121% |
| N. America | $84.5 | $26.9 | 214% | $177.1 | $67.1 | 164% |
| International | $10.4 | $9.9 | 5% | $32.9 | $28.0 | 18% |
| Gross Margin % (Ex OB Freight) | 39.7% (48.6%) | 47.6% (53.7%) | -790 BPS (-510 BPS) | 41.2% (49.8%) | 45.8% (52.6%) | -460 BPS (-280 BPS) |
| EBITDA** | $10.1 | $6.7 | 51% | $22.8 | $12.0 | 90% |
| Income | $2.7 | $4.8 | -44% | $7.3 | $6.9 | 6% |

///

///

///

///

///

///

**Celsius Holdings, Inc. and Subsidiaries**
**Consolidated Statements of Operations and Comprehensive Income**
**(Unaudited)**

| | For the three months ended September 30, | | For the nine months ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Revenue | $ 94,909,100 | $ 36,839,149 | $ 210,017,302 | $ 95,061,265 |
| Cost of revenue | 57,215,728 | 19,305,416 | 123,495,466 | 51,512,534 |
| Gross profit | 37,693,372 | 17,533,733 | 86,521,836 | 43,548,731 |
| | | | | |
| Selling and marketing expenses | 22,621,062 | 8,267,996 | 50,111,103 | 23,640,914 |
| General and administrative expenses | 11,140,030 | 4,752,428 | 28,066,228 | 13,178,593 |
| Total operating expenses | 33,761,092 | 13,020,424 | 78,177,331 | 36,819,507 |
| | | | | |
| **Income from operations** | 3,932,280 | 4,513,309 | 8,344,505 | 6,729,224 |
| | | | | |
| Other income (expense): | | | | |
| Interest income on note receivable | 76,473 | 78,690 | 239,586 | 268,709 |
| Interest expense on bonds | - | (144,021) | - | (391,458) |
| Interest on other obligations | (4,524) | (3,419) | (7,496) | (13,400) |
| Amortization of discount on bonds payable | - | (178,649) | - | (506,100) |
| Other miscellaneous expense | (97,038) | (62,817) | - | (27,614) |
| Gain on lease cancellations | - | - | - | 152,112 |
| Foreign exchange gain/(loss) | (327,581) | 550,510 | (451,217) | 646,515 |
| Total other income/(expense) | (352,670) | 240,294 | (219,127) | 128,764 |
| | | | | |
| **Net income before income taxes** | 3,579,610 | 4,753,603 | 8,125,378 | 6,857,988 |
| | | | | |
| Income tax expense | 833,819 | - | 833,819 | - |
| | | | | |
| Net income | 2,745,791 | 4,753,603 | 7,291,559 | 6,857,988 |
| | | | | |
| Other comprehensive income: | | | | |
| Foreign currency translation gain/(loss) | 1,282,683 | 110,027 | 1,367,169 | (113,144) |
| **Comprehensive Income** | 4,028,474 | 4,863,630 | 8,658,728 | 6,744,844 |
| | | | | |
| Income per share: | | | | |
| Basic | $ 0.04 | $ 0.07 | $ 0.10 | $ 0.10 |
| Diluted | $ 0.03 | $ 0.06 | $ 0.09 | $ 0.09 |
| Weighted average shares outstanding: | | | | |
| Basic | 74,609,195 | 70,473,351 | 73,758,731 | 70,184,071 |
| Diluted | 78,473,866 | 74,848,239 | 77,782,459 | 73,524,209 |

116.    During its earnings call the third quarter of FY 2021 on November 11, 2021, Defendant Fieldly assured the market (which included stockholders) and analysts that the Company's net income was solid.  Defendant Fieldly stated:

Net income.  As a result of the above, net income for the three months ended September 30, 2021 was $2.7 million or $0.04 per share based on a weighted average of 74.6 million shares outstanding and dilutive earnings of $0.04 per share based on a fully dilutive weighted average of 78.4 million shares outstanding. In comparison, for the three months ended September 30, 2020, the Company had net

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

33

income of $4.8 million or $0.07 per share based on a weighted average of 70.4 million shares outstanding and a dilutive earnings per share of $0.06 based on a fully dilutive weighted average of 74.8 million shares outstanding.

117.    The statement set forth above was false because when the Company accounted for its share-based compensation expenses properly, net income for the third quarter of FY 2021 was actually a net loss of $9.4 million, or ($0.13) per share.

118.    Also, during the Company's November 11, 2021 earnings call for its third quarter of FY 2021, Defendant Negron stated:

General and administrative expenses for the three months ended September 30, 2021 were $11.1 million, an increase of $6.4 million or 134% from $4.8 million for the three months ended September 30, 2020. This increase was mainly related to stock option expense, which amounted to $5.8 million for the three months ended September 30, 2021, an increase of $3.7 million, which accounts for 50% of the total increase in this area when compared to the prior-year quarter. Management deems it very important to motivate employees by providing them ownership in the business in order to promote their overperformance.

Administrative expenses amounted to $2.6 million or an increase of $1.3 million or 97% when compared to the prior-year quarter. This variance is mainly related to an increase in bad debt reserve of $200,000. And increases in audit costs, legal expenses, insurance costs and office rent account for the majority of the remaining fluctuation of $1.1 million. Depreciation and amortization increased by $200,000 when compared to the prior-year quarter.

Lastly, all other administrative expenses, which were mainly composed of research, development and quality control testing increased by $235,000 when compared to the second quarter of 2020. As a percentage of revenue, general and administrative expenses were 11.7% in the third quarter of 2021, when compared to 12.9% for the prior-year quarter. If we then exclude the non-operational stock option expense, general and administrative expenses for the 2021 quarter would amount to only 6% of revenues.

119.    This statement was false because the Company's G&A expenses for the three months ended September 30, 2021 were actually $23.3 million, not $11.1 million, when it accounted for expenses associated with its share-based compensation properly.

120.    The same day, the Company filed its quarterly report on Form 10-Q for the three-month period ended September 30, 2021, affirming the previously reported financial results. The 10-Q provided: "For the nine months ended September 30, 2021 and 2020, the Company recognized approximately $13.4 million and $4.7 million, respectively, of non-cash compensation

///

expense (included in general and administrative expense in the accompanying consolidated statements of operations and comprehensive income) . . . ."

121.    The statement above was materially false because non-cash compensation expense for the nine months ended September 30, 2021 was actually $15.3 million, when the Company accounted for its share-based compensation expenses properly.  This statement is also materially false because net income for the nine months ended September 30, 2021 was actually a net loss of $8.01 million and net income per share was actually negative $0.11.

**The Company's Statements Regarding
<u>Adequacy of Its Disclosure Were False</u>**

122.    Defendants made false statements to its stockholders regarding the adequacy of the Company's disclosure controls and procedures.  In its Form 10-Q for the second quarter of 2021, the Company disclosed that:

> [O]ur President and Chief Executive Officer and our Chief Financial Officer have concluded that as of June 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and board of directors.

123.    This statement was false because, as Defendants would later reveal in a Form 8-K issued on March 1, 2022: "the Company's previously issued unaudited consolidated financial statements for the period ended June 30, 2021 and September 30, 2021, should no longer be relied upon and are to be restated in order to reflect the appropriate accounting for the share based compensation awards modifications."

124.    The Company also reported in the same Form 8-K: "As a result of the breakdown in the design of controls over modifications to their share-based compensation . . . a material weakness exists in the Company's internal controls over financial reporting."

125.    Further, the Company's 10-Q for the three months ended September 30, 2021, stated that Defendants Fieldly and Negron "conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures . . . to ensure that information

required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported."  The Individual Defendants:

> concluded that as of September 30, 2021, our disclosure controls and procedures were effective in that (a) we maintain records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) our records provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and board of directors . . .

126.    This statement was false because as would later reveal in a Form 8-K filed on March 1, 2022, "the Company's previously issued unaudited consolidated financial statements for the period ended June 30, 2021 and September 30, 2021, should no longer be relied upon and are to be restated in order to reflect the appropriate accounting for the share based compensation awards modifications."

127.    The Company also reported in the same Form 8-K: "As a result of the breakdown in the design of controls over modifications to their share-based compensation . . . a material weakness exists in the Company's internal controls over financial reporting."

## **DEMAND FUTILITY**

128.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

129.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

130.    Plaintiff is a current owner of the Company stock and has continuously been an owners of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

131.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout
///

this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

132.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

133.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

134.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

135.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

136.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Fieldly**

137.    The principal professional occupation of Defendant Fieldly is his employment with the Company as its CEO pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Additionally, Defendant Fieldly is a named defendant in the Securities Class Action.

///

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

37

**Defendants Miller, Russell and Levy**

138.     Demand is excused because Defendants Miller, Russell and Levy face a substantial likelihood of liability for their misconduct.

139.     During the Relevant Period, Defendants Miller, Russell and Levy served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, inter alia, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

140.     Defendants Miller, Russell and Levy breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, inter alia, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Miller, Russell and Levy face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendant DeSantis**

141.     Defendant DeSantis is the son of Carl DeSantis, one of the principal stockholders of Celsius.  Carl DeSantis owns 24.9% of all the outstanding shares of the Company.

### COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

142.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

144.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

145.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

147.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against Defendant Fieldly for Insider Selling and Misappropriation of Information)

148.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.     At the time of his stock sales set forth herein, Defendant Fieldly knew of the information described above, and sold Company common stock on the basis of such information.

150.     The information described above was proprietary non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which Defendant Fieldly used for his own benefit when he sold Novavax common stock.

151.     Defendant Fieldly sales of Company common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

///

152.    Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendant Fieldly's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendant Fieldly obtained thereby.

## COUNT III

### (Against the Director Defendants For Unjust Enrichment)

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

155.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT IV

### (Against the Director Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    During the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose the truth to the marketplace as set forth above and as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.   Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

158.    As alleged herein, the Director Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Director Defendants, by

virtue of their receipt of information reflecting the true facts regarding the financial condition of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning the aforesaid, participated in the fraudulent scheme alleged herein.

159.    Director Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Director Defendants.

160.    The Director Defendants were each members of the Company's Board of Directors during the aforesaid time period.  Based on their roles at the Company, each of the Director Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

161.    At a minimum, the Director Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at the Company, the Director Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

162.    Likewise, the Director Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Director Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

163.   The allegations above also establish a strong inference that the Company, as an entity, acted with corporate scienter throughout the Relevant Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the Company's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, the Director Defendants maintained and/or increased the Company's artificially inflated common stock price throughout the Relevant Period.

164.   As such Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud; and

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

165.   As a result of the Director Defendants' misconduct, the Company is suffering litigation expenses and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

### **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.   Directing Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the

---

Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 11, 2023

Respectfully submitted,

**MATTHEW L. SHARP, LTD.**

_/s/ Matthew L. Sharp_

Matthew L. Sharp, Esq.
432 Ridge St.
Reno, NV 89501
Phone: (775) 324-1500
Email: matt@mattsharplaw.com

***Attorneys for Plaintiff***

## **VERIFICATION**

I,  DOREEN R. LAMPERT, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Celsius Holdings, Inc. common stock at all relevant times.

DOREEN R. LAMPERT